I would first like to begin by discussing appellant's letter brief, which was just submitted to the clerk this morning, and I believe you have a copy of the letter brief. And I would also like to discuss the government's letter brief. And in appellant's letter brief, the case of United States v. Jackson is referred to. The site is 181 F. 3rd, 740, and it's a Sixth Circuit case. And the reason why this case was submitted is because it is factually very similar to Mr. Alizondo's case. It involved a case where the district court originally sentenced the defendant to a low-end sentence within the sentencing range. And then upon resentencing, the court used a different sentencing guideline, a different sentencing range, because of an increase in the criminal history point of the defendant, but then imposed a sentence that was at the high end of the sentencing range. And in this case, the court of appeals found that the presumption of vindictiveness, the Pierce presumption of vindictiveness, was not rebutted because the district court failed to give any reason for sentencing the defendant at resentencing to a higher range. And in Mr. Alizondo's case, the same thing occurred. In the original sentencing, the court sentenced him to the low end of the sentencing range. At the original sentencing, it was a range of 46 to 57 months, and Mr. Alizondo was sentenced to 46 months. And then upon resentencing, a different sentencing guidelines manual was used. So the sentencing range was now 41 to 51 months, because the two-level enhancement for possession of a document-making device was no longer used. And this time, the court sentenced him to 46 months, which is in the mid-range of that sentencing range. And the district court is absolutely silent as to why, at the resentencing, it sentenced Mr. Alizondo to a mid-range sentence. And additionally, beyond the Jackson case, in this case, the district court also imposed a greater amount of loss. And the only reason that the district court gave for that is that it initially said it was going to go by the $3 million amount that it had found at the original sentencing. But then it said if you were going to dispute, if Mr. Alizondo is going to dispute that amount of loss, then it was going to reopen the whole matter. And it imposed a sentence of $6 million, about double the amount. I thought what he said was that he would leave it at a lower amount, but if your client really wanted it reopened, the government had said it was higher and he was going to let them prove it, and it might not be in your client's interest to reopen it. And your client said, yes, we want to reopen it. And then when he did, the government's figures were higher, and that was right. Well, I believe that reflects the dictiveness on the part of the district court. The reason is — I mean, you had the chance not to increase it, right? Well — Your option to open it up knowing that it could be increased. Well, I don't think the district court should have presented that kind of choice to Mr. Alizondo, because the whole reason he went through his appeal is so that he could have a resentencing, he could have the whole matter heard again, and, you know, for the court to reconsider everything again. And after going through all that trouble of going through his appeal, the court then says, well, if you want to dispute anything, then I'm going to go for the higher amount of loss. And I think that that — the record shows vindictiveness. I also think that's a fair characterization of the colloquy that between — I mean, you know, obviously we all have it, but it really did seem that he was trying — he would have — he was trying to give you the lower sentence, but it's — do you really think that it would be fair if you wanted to reopen it, that the government would be able to put in any evidence? Well, I think the issue here is, you know, the district court's motivation, the reason why it imposed the higher sentence. I think the record reflects the reason was because the defendant wanted to dispute it. But even more important, as the Jackson case shows, the court imposed a mid-range sentence the second time around and did not explain that whatsoever. Right, that he could have imposed a sentence at 51 months. So he imposed a lower sentence than he could have, which to me seems to rebut a claim of vindictiveness. I mean, if he were really vindictive in holding against your appeal, he could have sentenced you at 51 based on the evidence. Well, I believe in the Jackson — at least in the Jackson case, the court found that this did not — that there is a presumption of vindictiveness, and the court found that there was — that the district court did not rebut that presumption because the defendant was sentenced at a different point in the sentencing range without any explanation. And that's exactly what happened in this case. And also, the Payton case, which the government submitted in their letter brief, does not really apply, because in that case, it was — the record clearly showed that the reason why the court imposed a higher sentence the second time around was because it was correcting a sentencing error. And in this case, there was a sentencing error in that the wrong sentencing guideline was used. But that would mean that Mr. Elizondo should actually have received a sentence that was two levels lower. And instead, the court first increased the amount of loss, which increased the — which caused a one-level increase. And then on top of that, sentenced him to the mid-range instead of the low range. What would the range have been if you hadn't reopened the amount, if the amount had been the same? Instead of 6 million, it would have been 3.8. Well, if everything had been the same, it would have been — actually, I'm not — I'm not sure. I don't have the sentencing table before me. But it would have been two points lower. It would have been 37 to 46 months, wouldn't it? Instead, you got a range of 41 to 51. And both times he sentenced you to 46. Right. The first time he sentenced you at the high end, and the second time he sentenced you at the middle end, in the middle. And actually, the second sentence was harsher because it included a higher amount of loss, a higher amount of restitution, and it was at the mid-range instead of at the low range. And there was no explanation as to why he would suddenly be sentenced at the higher point in the range. He was sentenced at a lower point in the range. He was sentenced at the mid-range. Well, he was sentenced at the mid-range before. It was 46 to 57 months. He was given 46 months. So it was not proportionate. I mean, the second time around, it was 41 to 51 months, and he was sentenced to 46 months. So it was just, it was not proportionate, and there was no explanation for that. There was no explanation given by the Court. The explanation wasn't the new higher amount of loss? Well, that would not – the Court did not state that. The Court did impose a higher amount of loss, and then it just sentenced him at the mid-range instead of what should have been 41 months, because at the low end of the range, it would be 41 – at the very, you know, low end of the range, it would be 41 months, just like in the first sentencing, it was 46 months. The lowest he could have received was 46 months. In the original sentencing, he received 46 months. In the second time around, the lowest he could receive would be 41 months, and instead he was given 46 months. So the whole purpose of his appeal was nullified by the Court's action, and that's other Supreme Court cases have said is the reason for this presumption of vindictiveness. You're really out of time. Were there any other issues you would plan on arguing? Yes. I wanted to discuss briefly in regards to the government's so-called mistake in which they said that the amount of loss was going to be limited to a 10-day discrepancy between the loss date and the access date. And now they say that that's not actually the calculation that was used. And when you look at the sentencing transcript, this was not made clear to the Court. And in fact, the sentencing transcript mentions that same 5- to 7-day mailing date time, which was mentioned in the answering brief. So the district court was misled. And on top of the discrepancy between access and loss date, there are at least five other factors which show that there was not enough evidence for that $6 million amount of loss. And the other issues, I would just like to submit on the briefs, because I think they – it sufficiently addresses the other issues. And I'll reserve any extra time. All right. Thank you, Kathy. Thank you, Your Honor. Can I please report? My name is Susan DeWitt, and I represent the appellee, United States of America. First of all, Your Honors, I'd like to make sure that you did, in fact, get the errata that the government submitted, the notice of errata. It was submitted with the 28-J letter indicating that there was an error in the one-foot note and in the sentences at the end of the brief. I don't think I saw it, but it's – is it important? Well, it's the issue that was raised by Ms. Peterson as to the deletion by the court or deletion by the government of certain losses that fell within the 10- to 15-day range. In fact, that did not occur in the loss calculations that were submitted to the district court. And I want to – in error, I indicated that that had happened before the district court. It did not. So I wanted to make sure that the court knew that that – that this court knew that that – as to that part of the record, the brief is inaccurate. Ms. Peterson suggests that I or the government misled the district court as to what losses it was, in fact, considering. And that, Your Honor, is not true. The record does not support that finding. In particular, at the time of sentencing, the government very clearly stated to the court, and this is at the government's excerpt of record at page 75, that more, and I quote, The reality is that if a credit card is put in the mail on the first day of the month and Mr. Alessandro accesses it, it's stolen within a few days after that, Mr. Alessandro accesses it a month later or two months later or three months later and gets the profile information that's necessary to activate the card to the court.   And I quote,   accesses it a month later or three months later, it looked like he accessed it after the date. So the court made it – the government made it clear to the court that, yes, on this day, Mr. Alessandro had access to the information, and thereafter, there was a loss. Is that right? That's correct, Your Honor. And the reason – and I've created some great confusion there. But didn't you narrow – you narrowed the potential range of loss by doing that, didn't you? The – it doesn't change the loss calculation, but it makes the – it makes the loss information, because of my error in my brief, it makes it more confusing. So let me try to explain it so that I can clarify the confusion that I've created. Mr. Alessandro accesses profile information. That profile information is used to either activate credit cards, use credit cards, or set up fraudulent bank accounts, cash checks. The loss date or the date that's listed in the loss chart that the government submitted, it's a date. That date represents one of three things. It represents either the date that a credit card was mailed, a bulk mailing date, so that's a date that could be within 7 to 10 days of that date, or it represents a date that the credit card or the check was actually used. There's three different meanings to that particular date, and therein lies the confusion, because some credit card companies list the date that they believe the fraud occurred as actually the date that the credit card is put in the mail. Even though it's not used until a later date, it's stolen out of the mail, so they consider that to be when the fraud has begun to occur. So it appears as though the fraud has begun to occur at a date before the card is actually used. But your theory was that he was responsible. I mean, you were only computing for purposes of this showing his liability the amounts which are directly attributable to him in the sense that he got access and then there was an ensuing loss. That's correct, Your Honor. But some of the dates, what you're saying is that when you try to prove ensuing loss, you could prove it with a date that was not the actual date of the loss, but may even have been a date before he had access? That's right, because that's the date that the credit card was mailed. Let me just give you an example. If the credit card is mailed on February 1st, and Mr. Elizondo is asked by his co-conspirators to get profile information on the 15th of the month, and they don't use the credit card until the end of the month, they don't actually go out and get a cash advance on the credit card, if you look at the dates in the chart, it would appear from those dates that he accessed it before he accessed the information before this credit card was stolen, but in fact, he only accessed it. I thought it would show he accessed it afterwards. After the date of the loss, if you use the date the credit card is stolen, that's the date of the loss, your chart would show the loss occurred February 1st and his access is February 15th. That's right. If any of the losses that occur after he accesses it are clearly, there's no problem. The problem is that sometimes the dates appear to suggest that the loss occurred before he accessed it. And in fact, that's not what happened. What happened is that the particular credit card company or financial institution that submitted the loss information uses their date, the date that's in the chart, as a mailing date, the date that it was put in the mail, the date that the fraud in essence began because it was stolen on that date, even though it wasn't used until a later date. And does the law require you to prepare such a specific chart to calculate loss? I mean, after all, our standard is that you sentence based on a reasonable estimate of the loss. Yeah. And I believe the law does not require us to submit a loss chart. We did in this case because we wanted to show the overwhelming number of credit cards and checks that were directly linked to the audit trail that Mr. Alessandro accessed. I mean, just the sheer numbers. But under the guidelines, he could have been sentenced for the others that were joint conduct in furtherance of this. Absolutely. In fact, the losses that we had, a reasonable estimate of the entire losses for the overall conspiracy were in the neighborhood of $8 million, $9 million. We only attempted to hold him responsible for exactly those credit cards where there was a direct link. He accessed the profile information, and there was a loss for that person. Now, you chose that. I don't want to go into your strategy, but as just one legitimate method, because you could have chosen other methods to have arrived at. Your Honor, I chose that method as an attempt to be conservative, conservative in terms of my loss calculations. I was going to even be more conservative by eliminating those losses where there was that 10-day – there was more than that 10-day discrepancy. Ultimately, the losses that were submitted to the probation office included those losses. So at sentencing, and because I felt that it was still – those losses still were properly supported by the evidence, we went with that slightly higher loss calculation. And the Government explained to the Court the reason why there appeared to be a discrepancy there, and the Court adopted those findings. And I would submit that we've met the burden of proof necessary here, not only by a preponderance of evidence, which I believe is the appropriate standard, but also by clear and convincing evidence, because there simply is no explanation for why you have thousands of access – profiles accessed by a defendant that then relate to thousands of individuals who have fraud losses. But what about the – on your calculation, the listings that don't have an access date or a loss date at all? How are those linked to him? The – you cannot – you don't have a loss date on some of those, because the way that the Internet profiler who provided the information, their audit trail did not provide that information. But again, you've got a direct connection between him accessing the information and a person with the same name or the same Social Security card, Social Security number, or both, having a fraud loss. So, yes, you don't have as – as overwhelming an evidence in terms of the direct temporal relationship, but there's still a direct link between him. And when you couple that with the fact that you've got over a thousand credit cards or profiles that he accessed, and keep in mind that he himself admitted that he provided over 10,000 profiles to his co-conspirators specifically for the purpose of doing exactly the fraud that he's charged with here, the government only attempted to hold him responsible where – for those cards where there was direct links to him. And, yes, some of the links are better established by the evidence because of the nature of the information received from the financial institutions, and some of it is not as strong just because the nature of the evidence wasn't as detailed. That was the – that was the point I was making. When you say there are direct links to him, what does that mean when you don't have an access date? The direct links to him is that he himself went on the Internet and bought that information from an Internet information service provider. Every single loss that's listed on there is a – relates to an access that he did. The only difference is – But then you would have an access date, wouldn't you? If you knew – if you had an access – You should – you have an access date in the sense that, yes, there was a date that he accessed the information, but not all of the information providers could give us the particular date. They could tell us that he accessed it, but because of the way that they maintained the information, some of them – for example, some of them did a billing cycle at the end of the month. So if you look at some of the losses, it just lists the month. Some of them – That's losses, not access, Erin. But what I'm trying to find out here is that you say all the losses occurred in instances in which he had access. But as I understand it, there are some of these amounts where there is not an access date. There's not – we did not receive back from the Internet provider the date that he accessed. So they just – We did receive back confirmation that he did access that particular name, social security number, et cetera. So you kind of have to understand how this works. Yes. Right. So the Internet providers – what is the government doing about all these banks and Westlaw and Lexis and all those people who you can pay $200 a month and get everybody's social security number? I mean, this is – so you arrest this one person and stop this one fraud. I agree with you, Your Honor. It's a huge problem. And, you know, first and foremost, the legislature is trying to address it. These Internet providers, information providers, unfortunately, are acting legally and in good faith. Mr. Elizondo, as the record shows here, lied to them about this. Well, how did he get the – how was he able to get access to some of these banks to get the social security number? He – you can get it over the Internet. It's very easy. Oh, I didn't realize that. He represented to them – he represented to these companies that he had a legitimate business purpose for it. For example, people, believe it or not, businesses, if they make certain representations to these providers, can get this information if they say that they need it to verify credit, they need it to verify various different things that are legitimate business purposes. Is that good? No. Do I wish it was happening? No. Not as somebody who owns credit cards. But that's the reality of it. In this particular instance, though, Mr. Elizondo, although he was exploiting something legally, he did it through fraud. He lied to them about it. And then he did it knowing that he was giving it to people who were going to use it to commit further fraud. All right. So explain for – in response to Judge Reinhart's question, how it is that an Internet provider can confirm an access without being able to provide the information as to the date. Why these particular Internet providers did not retain or did not provide us with the access? Is it a function of how they keep records and what they were able to provide to us? I don't know. How do you know the access is before the loss, that he didn't get access after somebody else had caused the loss? I can only draw that conclusion based upon all the evidence that we have. That is that he said the reason – there's no other reason for him to access these. It's not just a coincidence that you have him admitting 10,000 accesses for the purpose of committing bank fraud, and 11 of them that are – 1,000 of them that are directly linked to him have fraud losses. I conceded at the district court level, and I will concede here, that, yes, there may be one or two people on here that just happened to be defrauded by somebody else, as well as attempted to be defrauded by him. Wouldn't it just have been easier once you were using that theory just to eliminate the ones where you didn't have an access date? It would have been – it certainly would have eliminated one other issue on appeal, but I would submit – I would submit that. It wouldn't have changed anything, probably. The only reason not to do that, Your Honor – I mean, I like to make things easier for myself, especially when it doesn't change the loss calculation – is I don't think it's fair to the people who are entitled to restitution. And that's – and especially when I was – Are you going to get $6 million worth of restitution from this fellow? No, we're not going to get – we're never going to get $6 million from him. But we are going to hopefully get some pro rata amount of that that's going to be divided amongst a whole lot of victims that were affected by this pretty, pretty massive fraud that was committed. 10,000 access devices is quite significant. Does Your Honor – do Your Honors have any questions about why I believe a preponderance of the evidence standard applies here or why I don't think there's indictiveness? No. Well, I don't. I think we can figure those issues out from the briefs. And then I think my – I'm guessing that my time is up. You're right. Well, okay. So I don't have any further questions from you. All right. Thank you. Thank you. Yes. I have a little bit of a reserve. Yes. Come on. We'll give you a little – we'll give you a little time. Okay. In Appellant's reply brief in Appendix D, it shows all the losses that precede the access date, and that's in the amount of $760,000. And then when you add the amount of loss where there was no access – there was no access date at all, that amounts to about a million dollars in losses. And we're not just talking about a discrepancy of 7 to 10 days between the loss date and the access date. We're talking about discrepancies of, a lot of times, 1 to 2 months. And there's really no way to tie that loss date to Elizondo's activities. When you have such a big lag of time, it could have been anyone else, that the loss could have been caused by anybody else accessing. Basically, if you're right and you knock a million dollars or so off, you're down to five million again. And then you think it should be remanded for resentencing, not only on the reduction of the restitution, but on the length of the sentence? I'm not sure what that does to the sentencing range, but definitely the amount of loss is wrong. You have all these things where, you know, it's not proven. I would leave him still within a range where he could get 46 months, if I'm correct. But certainly the restitution would be different. The restitution could be reduced. And also, there's a lot of other. He's not going to pay six million or five million anyway. It's not going to have a lot of practical effect, but it can be done. And there's also, you know, all the other reasons, you know, no Social Security number, all these other reasons. It's interesting that the government went to such lengths to prepare something so detailed that they really didn't need to do. They could have just taken the number of, they could have taken the 10,000 hits and multiplied it times the number of an amount, an average amount of loss and come up with the eight or nine million dollars. And instead, they did this very, very detailed thing that is dependent on the information that could be provided from the Internet providers who facilitated the fraud, which is spotty. And we don't know why that is. But in a way, they did far more than what they had to do to prove up this loss. And I would think that if we were to send this back to Judge Terizian, they could do more and come at it a different way. And you're equally risking, I don't know, I really don't, I really doubt that he would be vindictive, but you could be risking an even greater loss. Well, I don't know what to say to that, but I believe if you total all the questionable losses together, that would be a decrease. On this particular calculation, there are other ways to do this that are reasonable estimates of loss based on the facts in this case. Oh, well, it's the appellant's position that that doesn't meet a clear and convincing evidence standard which should be used in this case. But anyway, when you add all the questionable losses together, it actually leads to reduction in the offense level. Thank you very much, Your Honor. Thank you. Okay, my case just argued is submitted. Next case for oral argument is Fortune versus American Multi Cinema Inc. Thank you.
judges: Browning, Reinhardt, Wardlaw